USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-6-14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MIRIAM CARABALLO,                          :
                                           :
                          Plaintiff,       :          **REPORT AND**
                                           :          **RECOMMENDATION**
          - against -                      :
                                           :          **11 Civ. 6159 (PGG) (RLE)**
CAROLYN W. COLVIN,[1]                      :
**Commissioner of Social Security,**       :
                                           :
                          Defendant.       :

**To the HONORABLE PAUL G. GARDEPHE, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff Miriam Caraballo commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability benefits. On April 24, 2012, Caraballo moved for judgment on the pleadings, asking the Court to reverse the January 6, 2010 decision of the Commissioner and to remand for further administrative proceedings, including, but not limited to, a supplemental administrative hearing and a new decision. Caraballo argues that the administrative law judge ("ALJ") improperly rejected treating physician expert opinions and overlooked medical evidence. On June 27, 2012, the Commissioner cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for an order affirming the Commissioner's decision, and dismissing Caraballo's Complaint.

For the reasons that follow, I recommend that Caraballo's motion be **GRANTED** and that the case be **REMANDED** for the ALJ to conduct a supplemental administrative decision.

---

[1] At the time this case was commenced, the named defendant, Michael J. Astrue, was serving as the Commissioner of Social Security. Since then, Commissioner Astrue has stepped down, and the current Acting Commissioner is Carolyn W. Colvin. Rule 25(d) provides for Colvin's automatic substitution as a party. Fed. R. Civ. P. 25(d).

In this hearing, the ALJ should comprehensively reconsider Caraballo's case and consider a determination of disability that accords proper weight to Caraballo's treating physicians.

## II. BACKGROUND

### A. Procedural History

Caraballo applied for disability insurance benefits and supplemental security income ("SSI") on May 28, 2008. (Admin. Record ("A.R.") at 19.)  These claims were denied on October 2, 2008. (*Id.*)  On November 17, 2008, Caraballo requested a hearing before an ALJ. (*Id.*)  On November 20, 2009, Caraballo appeared with a non-attorney representative and testified at a hearing before ALJ David S. Pang.  Pang issued an opinion on January 6, 2010, denying Caraballo's disability claim. (*Id.* at 7.)  Caraballo requested review by the Social Security Appeals Council on March 11, 2011. (*Id.*)  On June 28, 2011, the Appeals Council denied Caraballo's request for review, thereby making the ALJ's decision final. (*Id.* at 1.) Caraballo filed this action *pro se* on August 24, 2011. (Compl. at 2.)  She secured legal representation on February 16, 2012. (Doc. No. 12.)

### B. The ALJ Hearing

#### 1. Caraballo's Administrative Hearing Testimony and Other Sworn Statements

Miriam Caraballo was born on June 20, 1959. (A.R. at 133.)  She completed the eleventh grade in 1978. (*Id.* at 162.)  From 1999 until May 2008, she worked as a waitress. (*Id.* at 37-38.)  She worked four hours a day, five days a week, and earned $125 a week; her posted annual wages never exceeded $7,300. (*Id.* at 144.)  Her job required her to lift and carry ten pounds, and required walking and standing for 1.5 hours. (*Id.*)

Caraballo has been diagnosed with a host of mental and physical impairments, including

2

bipolar disorder,[2] posttraumatic stress disorder ("PTSD"),[3] stomach ulcers, radiculopathy,[4] and arthritis. (*Id.* at 118.)  When Caraballo applied for disability benefits on June 21, 2008, she completed a Function Report explaining how her impairments limited her activities. (A.R. at 165-73.)  She stated that she did not need any special help or reminders to take care of her personal needs or grooming, that she prepared her own food daily, and that she could follow spoken and written instructions. (*Id.* at 167, 171.)

In November 2008, when she requested a hearing before an ALJ, Caraballo completed a Disability Report Appeal Form. (*Id.* at 177-83).  She indicated that, beginning in September 2008, her mental impairments had become more severe. (*Id.* at 178.)  She had become more disoriented and forgetful, and experienced more panic attacks. (*Id.*)  Caraballo also reported that she had foot surgery on November 14, 2008, because of pain in her foot and swelling of her knees. (*Id.*)

At the November 20, 2009 hearing, Caraballo testified that she stopped working at her job as a waitress in May 2008 because she was unable to concentrate and it was difficult for her to stand for long periods of time. (A.R. at 38, 43.)  In describing her mental impairments, she testified that she was "always angry and always crying," and felt that she was unable to perform her job. (*Id.* at 38.)  Caraballo stated that her two sons helped her tend to household chores, because of her physical and mental problems. (*Id.* at 40-41.)

---

[2] Bipolar disorder is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blow manic or mixed episodes. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000).

[3] PTSD is a severe anxiety disorder that can develop after exposure to any event that results in psychological trauma. *Id.*

[4] Radiculopathy is a disease of the nerve roots that causes inflammation of the spinal nerve.  Dorland's Illustrated Medical Dictionary 1404 (28th ed. 1994).

### 2. Medical Evidence

#### a. Mental Impairments

Caraballo has a history of bipolar disorder, depression, and PTSD. (*Id.* at 269, 274.) On May 23, 2005, she sought treatment for depression and panic attacks from Dr. Kirsten Andersen. (*Id.* at 263.) Dr. Andersen's clinical evaluation stated that Caraballo's symptoms began with her mother's death four years earlier and were aggravated by a physically abusive relationship with her boyfriend. (A.R. at 265, 268.)

On June 9, 2005, Caraballo was treated by Dr. Paulo G. Espanola for depression, poor sleep, and anxiety. (*Id.* at 269.) Dr. Espanola diagnosed Caraballo with major depressive disorder ("MDD"),[5] and listed the death of Caraballo's mother and problems with her teenage son as stressors. (*Id.* at 272.) He assigned Caraballo a past GAF[6] score of between seventy and eighty, and a present GAF score of sixty. He prescribed Wellbutrin and Vistaril. (*Id.*)

On December 10, 2007, Dr. Cynthia Rutherford and Dr. Arthur R. Jacobs treated Caraballo for irritability, depressed mood, insomnia, nervousness, forgetfulness, diarrhea, psychosocial stressors, and flashbacks. (*Id.* at 274.) The doctors assessed bipolar disorder and PTSD. (*Id.* at 274, 275.) They noted that Caraballo appeared calm and cooperative, that her thought process was logical, and that she was obese. (A.R. at 275.)

---

[5] *MDD* is a mental disorder characterized by the occurrence of one or more major depressive episodes. Dorland's Illustrated Medical Dictionary 245 (28th ed. 1994).

[6] A GAF score is utilized by a clinician to gauge an individual's overall level of functioning and his or her ability to carry out activities of daily living. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000). A GAF score between fifty-one and sixty signifies moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34. A GAF score between sixty-one and seventy signifies some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. *Id.* A GAF score between seventy-one and eighty signifies that if symptoms are present, they are transient reactions to psychosocial stressors and no more than slight impairment in social, occupational or school functioning. *Id.*

4

On March 14, 2008, Dr. Rutherford and Dr. Aelred Boyle treated Caraballo for irritability, depressed mood, insomnia, nervousness, forgetfulness, diarrhea, psychosocial stressors, and flashbacks. (*Id*. at 278.) Caraballo reported "problems with a co-worker sexually harassing" her, which caused her to experience nervousnous and flashbacks. (*Id.*)

On April 10, Caraballo saw Dr. Rutherford and Dr. Karen B. Rosenbaum with complaints of increased irritability, serious problems sleeping, and "not wanting to deal with anything." (*Id.* at 280.) Caraballo said that not sleeping was making it difficult for her to keep up with her work. (*Id.*) She reported issues with her boyfriend of eleven years, whom she described as judgmental and critical. (*Id.*) Caraballo was provided with supportive therapy, and restarted on her prescription for Ambien. (A.R. at 281.) The doctors prescribed Effexor and Lithium. (*Id.*)

On May 15, Dr. Andersen[7] completed a Treatment Plan Review. (*Id.* at 254-62.) She diagnosed Caraballo with bipolar disorder and PTSD, and assessed her with a current GAF score of fifty-six, and a prior GAF score of fifty-eight. (*Id.* at 254.)

On May 22, Dr. Rutherford and Dr. Boyle treated Caraballo for the same problems as on the March 14 visit. (*Id.* at 282.) Caraballo reported not being able to work without experiencing severe emotional distress. (*Id.*) She complained of forgetting orders at her job, feeling anxious, and having an inability to tolerate workplace stressors. (*Id.*) Dr. Rutherford and Dr. Boyle observed Caraballo to be sad with a "flat mood." (*Id.*) They discussed with her the idea of disability benefits, and encouraged her to learn more about public assistance. (A.R. at 283.)

On July 17, Caraballo sought treatment from Dr. Edilia Roman and Dr. Arthur R. Jacobs, complaining that she was able to sleep only two or three hours at night. (*Id.* at 284.) She stated that she recently stopped working as a waitress because of problems with her knees as well as

---

[7] In her motion for judgment on the pleadings, Caraballo refers to the treating doctor of this document as Dr. Rutherford. However, the clinician who signed the document is Dr. Kirsten Andersen.

forgetfulness. (*Id.*) She also reported that she had lost her last prescription medication. (*Id.*) Dr. Roman and Dr. Jacobs observed that Caraballo had a sad mood. (*Id.*) They noted, however, that her thought process was logical and that there was no suicidal or homicidal ideation. (*Id.*) Caraballo continued to be diagnosed with bipolar disorder and PTSD. (A.R. at 285.) Dr. Roman and Dr. Jacobs noted a current GAF score of fifty-six. (*Id.*)

### b. Physical Impairments

#### (1) *Bronx Lebanon Hospital*

On August 23, 2007, Caraballo was referred to Dr. Myrtha Daniel for iron deficiency anemia and epigastric[8] discomfort. (*Id.* at 227.) One week later, Caraballo underwent an upper endoscopy, which showed a stomach ulcer. (*Id.* at 226.) A sonogram of the abdomen revealed gallstones.[9] (*Id.*)

#### (2) *Montefiore Medical Center*

On March 18, 2008, Caraballo went to the emergency room of Montefiore Medical Center ("Montefiore") with complaints of right knee pain. (*Id.* at 200.) An x-ray of the knee revealed no fracture or dislocation, but showed a small amount of fluid in the kneecap. (A.R. at 206.) The attending physician referred Caraballo for an orthopedic evaluation. (*Id.* at 205.)

On March 27, Dr. Laura McGarry examined Caraballo. (*Id.* at 245.) She referred Caraballo for a sonogram of the abdomen because of Caraballo's history of gallstones. (*Id.* at 248.) A March 31 sonogram showed the presence of gallstones (*id.* at 251), which were removed on April 29. (*Id.* at 213-15.)

---

[8] Epigrastric means pertaining to the upper middle region of the abdomen. Dorland's Illustrated Medical Dictionary 566, 1441 (28th ed. 1994).

[9] A gallstone is a concretion, usually of cholesterol, formed in the gallbladder or bile duct. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 64 (4th ed., text rev. 2000).

On June 1, Caraballo was treated at the emergency room of Montefiore for a laceration of her left knee. (A.R. at 216-24.) An x-ray showed mild degenerative changes in the knee, but did not show a fracture, dislocation, or build-up of fluid in the joint. (*Id*. at 224.) On July 1, Dr. McGarry examined Caraballo again for her knee pain. (*Id*. at 250.) She diagnosed arthritis, and referred Caraballo for an orthopedic examination. (*Id*.) On November 4, Caraballo underwent arthroplasty to correct hammertoes. (*Id.* at 341.)

In April, 2009, Caraballo was treated for numbness in her right foot and back pain. (*Id*. at 330.) She was examined by a physician in the Clinical Neurophysiology Laboratory of Montefiore. (*Id*.) Dr. Phyllis Bieri performed a nerve conduction study of Caraballo's lower extremities. The results suggested mild radiculopathy. (*Id.*)

On May 21, 2009, Dr. McGarry examined Caraballo after complaints of pain in her hips and lower back. (A.R. 343.) Dr. McGarry diagnosed arthritis of the hips and lumbar disc disease, and referred Caraballo for an orthopedic evaluation. (*Id.*)

### c. Treating Source Opinion Evidence

#### (1) *Dr. Edilia Roman – December 17, 2008*

On December 17, 2008, Dr. Edilia Roman completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." (*Id*. at 326-28.) Dr. Roman's opinion was that Caraballo had "mild limitations" in her ability to understand, remember, and carry out simple instructions; "moderate limitations" in her ability to make judgments on simple work-related decisions, and to understand, remember, and carry out complex instructions; and "marked limitations" in her ability to make judgments on complex work-related decisions. (*Id*. at 326) Dr. Roman identified poor sleep, poor concentration, nightmares, and flashbacks of past abuse as factors that supported her assessment. (*Id*.)

7

Dr. Roman further opined that Caraballo's impairment caused "marked limitations" in her ability to interact appropriately with the public, supervisors, and co-workers, and "moderate limitations" in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*) Dr. Roman identified bipolar disorder with mood swings, irritability, and poor sleep as factors supporting her assessment. (*Id.*)

### (2) *Dr. Laura McGarry – October 23, 2009*

On October 23, 2009, Dr. McGarry examined Caraballo and completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (A.R. at 358-61.) With respect to exertional limitations, she noted that Caraballo's impairments affected her ability to stand and walk for less than two hours in an eight-hour workday, but that these impairments did not affect her ability to sit, push, or pull. (*Id.* at 358-59.) With respect to postural limitations, she opined that Caraballo could occasionally climb and stoop, but could never balance, kneel, crouch or crawl. (*Id.*)

### (3) *Dr. Kirsten Andersen – November 19, 2009*

On November 19, 2009, Dr. Andersen completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." (A.R. at 367-70.) She opined that Caraballo was "slightly limited" in her ability to understand, remember, and carry out short, simple instructions, "moderately affected" in her ability to make judgments on simple work-related decision, and "markedly affected" in her ability to understand, remember, and carry out detailed instructions. (*Id.* at 367.) Dr. Andersen attributed Caraballo's limitations to bipolar disorder, depression, and anxiety. (*Id.*) Caraballo's racing thoughts and auditory hallucinations also interfered with her ability to focus. (*Id.*)

8

Dr. Andersen also opined that Caraballo's impairment caused "marked limitations" in her ability to interact appropriately with the public, supervisors, and co-workers, as well as in her ability to respond appropriately to pressures in a usual work setting. (A.R. at 369.) She noted that Caraballo had "moderate limitations" in her ability to respond appropriately to changes in a routine work setting. (*Id.*) In support of this assessment, Dr. Andersen stated that Caraballo had been diagnosed with bipolar disorder and PTSD and had symptoms of hyper-mania, which interfered with Caraballo's ability to cope with stress and caused her to become easily involved in arguments. (*Id.*) Finally, Dr. Andersen noted that Caraballo had a limited ability to leave her house, causing her to stay home and miss appointments. (*Id.*)

#### (4) *Dr. Laura McGarry – November 23, 2009*

On November 23, 2009, Dr. McGarry completed another "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (A.R. at 373.) This statement is virtually identical to the October 23, 2009 statement (*see id.* at 358-61), the only difference being a notation in the November report that Caraballo's "knee pain is worsened by the limited activities and is improved by elevation." (*Id.*)

### d. Consultative Examination Reports

#### (1) *Dr. Herb Meadow – July 14, 2008*

On July 14, 2008, Dr. Herb Meadow, a psychiatrist, evaluated Caraballo. (A.R. at 229.) Caraballo reported that she lived with two sons and that she last worked as a waitress in May 2008 but, because of problems with her right knee, she left her job. (*Id.*) Caraballo complained of difficulty falling asleep and concentrating, semi-weekly panic attacks, and experiencing mood swings, crying, irritability, low energy, and diminished self-esteem. (*Id.*) Dr. Meadow stated that Caraballo's demeanor was cooperative, and her manner of relating was adequate. (A.R. at

9

230.) Her gait, posture, and motor behavior were normal, and she made appropriate eye contact. (*Id.*) Caraballo's thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia. (*Id.*) Dr. Meadow assessed Caraballo's mood as depressed. (*Id.*) He assessed her recent and remote memory skills as intact, and her cognitive functioning as average. (A.R. at 230-31.)

Dr. Meadow diagnosed bipolar disorder, panic disorder without agoraphobia, and right knee pain. (*Id.*) He opined that Caraballo "would be able to perform all tasks necessary for vocational functioning." (*Id.*) The doctor wrote that the examination results were consistent with Caraballo's psychiatric problems, but "in itself, this does not appear to be significant enough to interfere with" Caraballo's ability to function on a daily basis. (*Id.*)

### (2) *Dr. Sharon Revan – July 14, 2008*

Dr. Sharon Revan physically examined Caraballo on July 14, 2008. (A.R. at 233.) Caraballo reported a two-year history of knee pain, having fallen many times in the past, and stated that she had knee surgery in 2005 "due to damaged cartilage." (*Id.*) She ranked the pain as an eight out of ten. (*Id.*) Caraballo experienced knee pain while lying down, standing, and climbing stairs. (*Id.*) Caraballo stated that she was able to shower and dress without help, but that her sons had to help her cook, clean, do laundry, and shop. (A.R. at 234.)

Caraballo's gait and stance were normal, and she could walk on her heels and toes without difficulty. (*Id.*) She did not need help changing for the examination or getting on and off the examination table. (*Id.*) Dr. Revan determined that Caraballo had full range of motion of her hips, knees, and ankles, but that she reported pain in her right knee. (A.R. at 235.) Caraballo's strength was five out of five in the upper and lower extremities. (*Id.*) Dr. Revan assessed Caraballo to be stable, with no redness, heat, swelling, or effusion of the joints. (*Id.*)

10

Dr. Revan noted Caraballo's four diagnoses: bipolar disease, depression, knee pain, and stomach ulcers. (A.R. at 235-36.) In her Medical Source Statement, Dr. Revan opined that Caraballo had no limitations of her speech, vision, hearing, use of her upper extremities for fine and gross motor activity, sitting, personal grooming, or activities of daily living. (A.R. at 236.) Dr. Revan stated that because of right knee and leg pain, Caraballo had "mild limitations" on walking distances, climbing stairs, and standing. (*Id.*)

### (3) *L. Meade, Psychology – September 26, 2008*

On September 16, 2008, Dr. L. Meade completed a Psychiatric Review Technique of Caraballo's file. (A.R. at 309-21.) Dr. Meade indicated that Caraballo had an affective disorder and an anxiety disorder, neither of which were severe. (A.R. at 309.) Dr. Meade did not offer any details to support this conclusion. (A.R. at 310-21.) Of the fourteen-page form, only the first page is completed, and Dr. Meade provided no notes in the spaces provided. (*See* A.R. at 309-21.)

### (4) *F.E.G.S. Biopsychosocial Summary – June 2008*

In June 2008, social workers, case managers, and a physician at Federation Employment Guidance Service ("F.E.G.S.") conducted a Biopsychosocial Summary of Caraballo for purposes of processing her application for public assistance and food stamp benefits. (A.R. at 289-304.) Caraballo reported a history of mental health issues, including depression, anxiety, panic attacks, and bipolar disorder. (A.R. at 295.) She told caseworkers that in the two weeks prior to the examination she had experienced tiredness and lack of energy, felt bad about herself, and had trouble concentrating. (*Id.*) She said that she had not experienced depression or hopelessness, lack of interest in doing things, trouble falling asleep, or poor appetite. (*Id.*) Caraballo indicated that there were several activities she was able to complete on her own, including traveling by

11

public transportation, cleaning her home, dressing and grooming herself, going to the bathroom, shopping for groceries, cooking meals, and socializing. (A.R. at 297.) As barriers to employment, Caraballo reported that she became depressed at work and had difficulty working with other people. (*Id.*)

Dr. Michael Ward, the Medical Director at F.E.G.S., examined Caraballo, and reported that her physical examination was normal. (A.R. at 300.) He noted no physical limitations. (*Id.* at 300-02.) Although Dr. Ward indicated that Caraballo had work limitations, he did not state the number of hours Caraballo would be able to perform specific physical work functions such as stand, walk, or sit in an eight-hour period, or the number of hours she could carry heavy items during an eight-hour period. (A.R. at 301-02.) He concluded that she should "avoid stressful positions including dealing with public [sic] in time-sensitive manner." (A.R. at 303.)

### 3. The ALJ's Decision

On January 6, 2010, ALJ Pang denied Caraballo's request for disability benefits. He concluded that Caraballo was not disabled within the meaning of the Act because her impairments, while severe, neither satisfied the disability listing criteria set forth in the regulations, nor prevented her from working. (A.R. at 19, 21-28.) Pang made eleven findings of fact and conclusions of law. (*See* A.R. at 21-28.) First, he established that Caraballo met the "insured status requirements" of the Act, that she "ha[d] not engaged in substantial gainful activity since May 28, 2008," and that she has several "severe impairments," including bipolar disorder, panic disorder, PTSD, obesity, and arthritis. (*Id.* at 21.)

Under his fourth finding, Pang ruled that Caraballo "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* at 22.) He explained that Caraballo's mental

12

impairments, considered alone and in tandem, did not meet or equal the criteria of listings 12.04

(affective disorders) and 12.06 (anxiety-related disorders). (A.R. at 22.) He found that

Caraballo had only "mild" restriction in her daily activities, and "moderate" difficulties in social

functioning and with regard to concentration. (*Id.*)

> Under his fifth finding, Pang wrote:
>
> I find that the claimant has the residual functional capacity to perform light work
> . . . except the claimant can occasionally climb, stoop, crouch, kneel or crawl; can
> tolerate only occasional and intermittent interaction with the public; the claimant
> retains the ability to understand, remember and carry out simple instructions, make
> judgments on simple work related decisions, interact appropriately with supervisors
> and co-workers in routine work settings, and respond to usual work situations and
> changes in a routine work setting.

(*Id.* at 23.) Although Pang found Caraballo's mental and physical impairments could reasonably

be expected to cause her subjective symptoms, he did not find her statements concerning the

intensity, persistence, and limiting effects credible. (A.R. at 24.)

Pang stated that, although he found the Caraballo's diagnosis of arthritis of both knees

objectively verifiable, he did not find the condition as limiting as alleged. (A.R. at 23.) He

based this opinion on a medical report in which Caraballo demonstrated full range of motion in

both knees and full strength in both legs in July 2008; a separate physical examination in June

2008 where Caraballo stated that she had no pain, did not complain of knee problems, and her

musculoskeletal exam was normal; and the fact that Caraballo was not on medication for the

pain, suggesting that it was not disabling. (A.R. at 24.)

Similarly, Pang did not find Caraballo's diagnoses of bipolar disorder, panic disorder,

and PTSD as limiting as alleged. (A.R. at 24, 25.) He pointed to evidence that Caraballo's

mental conditions are well-controlled on medication, and cited two mental health evaluations in

which Caraballo stated that she did not feel down or depressed, did not have trouble sleeping, could travel independently by bus, and performed all activities of daily living. (A.R. at 25.) Pang found Caraballo's statements regarding her ability to perform activities of daily living to be inconsistent, negatively impacting her credibility. (*Id.*)

Also under the fifth finding, Pang evaluated opinion evidence of Caraballo's physicians. He assigned Dr. Revan's consultative opinion "great weight" because it was based on an in-person examination of Caraballo, and because it was "in accord with the record as a whole relating to [Caraballo's] physical impairments." (A.R. at 25.) He assigned Dr. McGarry's treating opinion "some weight" because of the treating relationship, given that Dr. McGarry had seen Caraballo since March 2008. (*Id.*) Pang did not assign Dr. McGarry's treating opinion "controlling weight" because it was not "in accord with the record as a whole and conflict[ed] with another medical opinion in the record." (*Id.*) He found Dr. McGarry's opinion that limited Caraballo's ability to stand, walk, and perform postural activities to conflict with the "largely normal results" of Caraballo's physical examinations with Dr. Ward and Dr. Revan. (*Id.*)

Pang found the record contained five conflicting opinions regarding Caraballo's ability to perform basic work activities with her mental impairments. (A.R. at 25-26.) He evaluated the consultative opinions of Dr. Meadow, Dr. Ward, and Dr. Meade, and the treating opinions of Dr. Roman and Dr. Andersen. (A.R. at 26.) Pang assigned Dr. Meadow's opinion "some weight" because "it did not consider [Caraballo's] course of treatment for her mental impairments and the resulting credible subjective complaints, which reasonably limited her to simple work and limited public interaction." (A.R. at 25-27.) Pang assigned Dr. Ward's opinion "some weight" because it was based on a thorough biopsychosocial intake by the F.E.G.S. team, and supported Pang's assessment of Caraballo's residual functional capacity ("RFC") to work. (A.R. at 26.)

The ALJ was not persuaded by Dr. Meade's opinion because it "neglect[ed] the claimant's treatment for her impairments and the credible symptoms therefrom, and it was offered by a physician who did not have a chance to examine" her. (*Id.*)

Pang assigned the treating opinions of Dr. Roman and Dr. Andersen "some weight" because they were based on Caraballo's course of treatment at Bronx Lebanon Hospital. (*Id.*) He afforded Dr. Andersen's treating opinion more weight than that of Dr. Roman because Dr. Andersen had treated Caraballo several times between 2005 and 2008. (*Id.*) Although Pang agreed that Caraballo could not perform skilled work, he determined that Caraballo was not as "limited" as Dr. Roman and Dr. Andersen opined. (*Id.*) The ALJ did not assign either Dr. Roman or Dr. Andersen "controlling weight" because they were not in "accord with the record as a whole and conflict[ed] with other medical opinions in the record." (*Id.*)

Under the tenth finding, Pang determined that, considering Caraballo's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that [she] can perform." (A.R. at 27.) He cited to testimony from the vocational expert, who declared that Caraballo would be able to perform the requirements of occupations such as compression molder (11,810 jobs nationally; 1,125 jobs regionally) and housekeeper (1,125,685 jobs nationally; 18,952 jobs regionally). (A.R. at 28.) Pang concluded that Caraballo was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and made a finding of "not disabled." (*Id.*)

## C. The Appeals Council Denial of Review

Caraballo requested review by the Appeals Council on March 11, 2011. (A.R. at 7.) In support of her petition, she submitted additional evidence for review, including an x-ray of her hand taken in April 2010, which revealed mild degenerative changes (A.R. at 386); and two

15

MRIs, taken in May 2010, of her knees, showing joint effusion and tearing of the medial meniscus. (A.R. at 382-83.) On June 28, 2011, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Caraballo's request for review. (A.R. at 1.)

## III. DISCUSSION

### A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).[10] Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord*

[10] 42 U.S.C. §§ 405(g) and 1383(c)(3) both govern judicial review of a final decision to deny Social Security benefits, with the former governing SSDI claims and the latter SSI claims. Judicial review is functionally identical under either provision, however, because § 1383(c)(3) merely incorporates § 405(g) by reference.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g),[11] especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the

---

[11] Sentence four provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d

1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of

medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v.*

*Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence

of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d

Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002

WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409

(reconsideration of improperly excluded evidence typically requires remand). Eschewing rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250,

269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

     When "new and material evidence" is submitted, the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the

administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to

"any evidence that has not been considered previously during the administrative process."

*Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

     Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as

an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a

disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be

"consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness."

*Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at \*7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

22

## C. Issues on Appeal

Caraballo claims that the administrative decision to deny her application for disability benefits should be vacated because the ALJ:  (1) improperly rejected treating source evidence demonstrating that Caraballo could not stand and walk for two hours in an eight-hour workday; (2) overlooked evidence of bilateral knee pain; and (3) improperly relied on vague and imprecise statements of functional limitations.  (Pl.'s Reply Mem. at 1.)

First, Caraballo alleges that the ALJ improperly rejected the evidence from her treating physician finding that Caraballo lacked the capacity to perform the demands of light work because she could not stand and walk for two hours in an eight-hour workday.  (Pl.'s Mem. Supp. J. Pleadings at 1.)  Caraballo argues that the evidence before the ALJ adequately supported the treating physician's opinion, and that the rejection of such opinion was based on evidence that "completely overlooked Caraballo's complaints of bilateral knee pain and which otherwise relied on vague and imprecise statements of limitation."  (*Id.*)  Caraballo further claims that the ALJ failed to offer good reasons to explain the rejection of Caraballo's treating psychiatrist and psychologist.  (*Id.*)  Finally, Caraballo argues that post-hearing medical evidence submitted to the Commissioner's Appeals Council was summarily rejected, despite the fact that such evidence confirmed significant abnormalities in Caraballo's knees.  (*Id.*)

### 1. The ALJ Erred in Failing to Give Controlling Weight to the Opinions of the Treating Physicians.

After considering Caraballo's mental and physical impairments, the ALJ found that Caraballo had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  In determining Caraballo's RFC, the ALJ assessed the opinions of her treating and consultative physicians.  He did not assign "controlling weight" to any of the treating physicians'

opinions, including: (1) Dr. Roman's December 2008 assessment; (2) Dr. Andersen's November 2009 assessment; (3) Dr. McGarry's October 2009 assessment; and (4) Dr. McGarry's November 2009 assessment. (A.R. at 24-26.) In discounting these opinions, the ALJ violated the treating physician rule.

### a. The ALJ erred in his determination about the weight to assign to Caraballo's treating physicians regarding her physical impairments.

Dr. McGarry, one of Caraballo's treating physicians, examined Caraballo on several occasions at Montefiore, beginning on March 27, 2008. (A.R. at 200.) In July 2008, Dr. McGarry diagnosed Caraballo with arthritis of the knees, and in May 2009, she diagnosed her with arthritis of the hips and lumbar disc disease. (A.R. 250, 343.) After further examinations in 2009, Dr. McGarry opined that Caraballo was limited to standing and walking for less than two hours in an eight-hour work day because of knee pain. This limitation would preclude Caraballo from "light" work because light work requires "a good deal" of standing or walking. *See* 20 C.F.R. § 404.15667(b); SSR 83-10 ("since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday").

The ALJ assigned Dr. McGarry's treating opinion "some weight" "because of the treating relationship between the claimant and Dr. McGarry, who has seen the claimant variably at Montefiore since March 2008." (A.R. at 25.) The ALJ did not assign Dr. McGarry's opinion "controlling weight" because he found that it "conflict[ed] with another medical opinion in the record," specifically the reports authored by Dr. Ward and Dr. Revan (*Id.*) Those reports characterized Caraballo as displaying "largely normal results." (*Id.*)

The sparse remarks from Dr. Ward and Dr. Revan fall short of providing "good reasons" for rejecting a treating physician's opinion. Further, it is not actually clear that the phrase

24

"largely normal" conflicts with Dr. McGarry's opinion.  Nothing in the record suggests that Dr. McGarry's opinions were not supported by medically acceptable clinic and laboratory diagnostic techniques.  The ALJ failed to follow the mandates of C.F.R. 404.1527(c)(2).

Additionally, although the ALJ found the opinions of Dr. Ward and Dr. Revan consistent with the substantial evidence of record, their opinions do not actually corroborate one another. Dr. Ward's report noted that Caraballo's physical examination was "normal," and that no physical limitations were present.  (A.R. 300-02.)  However, Dr. Ward's review of Caraballo's condition was devoid of any medical evidence, and overlooked Caraballo's bilateral knee pains – issues that were brought to Dr. McGarry's attention in March, May, and July 2008.  (A.R. at 200, 216-22, 250.)[12]  Dr. Revan, unlike Dr. Ward, noted physical limitations: she opined that Caraballo had "mild limitations" in walking distances, climbing stairs, and standing because of right knee and leg pain.  (A.R. at 236.)

Because the ALJ failed to provide "good reasons" for not crediting Dr. McGarry's treating opinion, the case should be remanded.

### b. The ALJ erred in determining the appropriate weight to assign to Caraballo's treating physicians regarding her mental impairments.

The ALJ did not adequately explain his decision to afford "some weight" to the opinions of treating physicians Dr. Roman and Dr. Andersen.[13]  He considered both doctors "treating sources" but declined to afford their opinions controlling weight, "as they are not in accord with the record as a whole and conflict with other medical opinions in the record."  (*Id.*)  The ALJ

---

[12] Dr. Ward's report had additional deficiencies.  For example, he failed to indicate the number of hours Caraballo could perform certain physical work functions, such as sit, walk, or stand.  (A.R. at 302.)

[13] The ALJ assigned Dr. Roman's opinion less weight than Dr. Andersen's opinion, while also noting that Dr. Andersen had seen and treated Caraballo several times between 2005 and 2008.  (A.R. at 26.)

agreed that Caraballo could not perform skilled work, but noted that she was not as "limited" as either physician opined. (*Id.*) The ALJ's remarks, without anything more to substantiate them, fall short of the ALJ's duty to provide "good reasons" for rejecting a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

The ALJ afforded the same amount of weight ("some weight") to the opinions of two consultative physicians, Dr. Meadow and Dr. Ward, even though he acknowledged that the consultative examinations had not considered Caraballo's course of treatment for her mental impairments. (A.R. at 25-27.) The ALJ failed to indicate why he chose to credit the opinions of the consulting physicians over those of the treating physicians, particularly when he found the consultative opinions lacked a complete picture of Caraballo's mental impairments. While contradictions in the medical record are for the ALJ to resolve, *Burgess*, 537 F.3d at 128, they cannot be resolved arbitrarily. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). The Court finds that the ALJ's failure to articulate a basis for accepting the incomplete findings of the consultative examinations over Carballo's treating physicians was arbitrary, and recommends that the case be remanded for reconsideration.

### 2. The Appeals Council Properly Declined to Evaluate the New Evidence Submitted After the ALJ's Decision.

Caraballo submitted additional evidence for review by the Appeals Council. Where a claimant submits new and material evidence to the Appeals Council upon a request for review of the ALJ's decision, the Appeals Council shall evaluate the entire record, including the new and material evidence *if* the evidence relates to the period on or before the date of the ALJ's decision. 20 C.F.R. §§ 404.970(b), 404.976(a), 416.1470(b), 416.1476(b) (emphasis added). Here, the claimant had been examined on several occasions after the ALJ's decision and

presented the evidence from the examinations to the Appeals Council.  (A.R. at 382-83, 386, 389.)  Because this evidence did not relate to the period on or before the date of the hearing, it will not be considered.  Even if the evidence had been created and submitted before the ALJ's decision, this Court's recommendation on the matter would not be altered.

**D. Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing.  Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83.

27

## IV. CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be **DENIED**, Caraballo's motion be **GRANTED**, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to: (1) comprehensively reconsider Caraballo's case; and (2) comprehensively consider a determination of disability that accords proper weight to Caraballo's treating physicians.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, 40 Foley Square, Room 2204, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: January 6, 2014**
**New York, New York**

Respectfully Submitted,

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**